Marcy Jaspers, Mary Jo Jaspers,
Donna Mae Jaspers, and Gary Jaspers,
individually and on behalf of all others
similarly situated,

        Plaintiffs,

v.

Prime Vest Financial Services, Inc.;
Guaranty Brokerage Services, Inc.;
Bancnorth Investment Group, Inc.;
ING America Insurance Holdings, Inc.;
Cetera Financial Group;
Lightyear Capital, LLC; and
ING Advisors Network,

        Defendants.

Civil No. 10-853 (DWF/RLE)

**MEMORANDUM
OPINION AND ORDER**

---

Daniel E. Gustafson, Esq., Daniel C. Hedlund, Esq., and David A. Goodwin, Esq., Gustafson Gluek PLLC; Daryl DeValerio Andrews, Esq., Nathaniel L. Orenstein, Esq., and Peter A. Pease, Esq., Berman DeValerio; and Mark E. Czuchry, Esq., Czuchry Law Firm, LLC, counsel for Plaintiffs.

Aimee D. Dayhoff, Esq., and David P. Pearson, Esq., Winthrop & Weinstine, PA; James V. Garvey, Esq., and Timothy M. Schank, Esq., Vedder Price PC; and Joseph M. McLaughlin, Esq., Simpson Thacher & Bartlett LLP, counsel for Defendants PrimeVest Financial Services, Inc., Guaranty Brokerage Services, Inc., Cetera Financial Group, and Lightyear Capital, LLC.

Daniel J. Supalla, Esq., and Julie H. Firestone, Esq., Briggs & Morgan, PA; and Jeffrey T. Petersen, Esq., Matthew G. Ball, Esq., and Sara E. Fletcher, Esq., K&L Gates LLP, counsel for Defendant Bancnorth Investment Group, Inc.

Jeannine L. Lee, Esq., Sara H. Daggett, Esq., and Steven E. Rau, Esq., Flynn Gaskins & Bennett, LLP; counsel for Defendant ING America Insurance Holdings, Inc.

This matter is before the Court on a Motion to Remand brought by Plaintiffs Marcy Jaspers and her children, Mary Jo Jaspers, Donna Mae Jaspers, and Gary J. Jaspers (collectively, "Plaintiffs") and on a Motion to Dismiss brought by Defendants PrimeVest Financial Services, Inc., Guaranty Brokerage Services, Inc., Bancnorth Investment Group, Inc., ING America Insurance Holdings, Inc., Cetera Financial Group, Lightyear Capital, LLC, and ING Advisors Network (collectively, "Defendants"). For the reasons set forth below, the Motion to Remand is denied as moot, and the Motion to Dismiss is granted.

## BACKGROUND

This case stems from allegations that Defendants did not properly apply volume discounts to front-end sales charges for certain mutual fund transactions Defendants executed on Plaintiffs' behalf, resulting in Plaintiffs paying excessive sales charges and thereby reducing the money that could have been invested in mutual fund shares. (Compl. ¶ 6.) Plaintiffs filed the action on February 25, 2010, in Minnesota District Court in Stearns County. Defendants removed the case to this Court on March 18, 2010. Defendants filed an Amended Notice of Removal on March 25, 2010. (Doc. No. 15.)

The Complaint describes the system by which mutual funds charge sales charges and expenses for running the mutual funds, including the "front-end sales charge"—the commission that investors pay at the time of purchase. (Compl. ¶ 26.) The amounts of such front-end sales charges are "dependent on the specific mutual fund being purchased." (*Id.* ¶ 28.) Volume discounts for higher investment amounts "can be triggered by current or simultaneous purchases of mutual fund shares, or by a series of

2

transactions that qualify for a combination through certain 'Rights of Accumulation.'" (*Id*. ¶ 29.) The Complaint describes how front-end sales charges "may be reduced if an investor or group of investors purchases or agrees to purchase a certain dollar value of shares at one time or over time." (*Id*.) The purchase amounts at which the front-end sales charges decline are called "breakpoints." (*Id*.) The Complaint asserts that these breakpoints are required to be disclosed in each mutual fund's prospectus and on the mutual fund's website. (*Id*. ¶ 30.)

According to the Complaint, "[m]ost, if not all [,] Mutual Funds that have [front-end] Sales Charges allow their investors to combine all of their current or simultaneous purchases for purposes of qualifying for breakpoints, even if the purchases are intended as gifts." (*Id*. ¶ 32.) The Complaint alleges that many mutual funds allow investors "Rights of Accumulation" by which investors qualify for breakpoint discounts when they make multiple purchases, even though a single purchase would not, on its own, qualify for the discount. (*Id*. ¶ 33.)

PrimeVest, a Minnesota corporation, is a registered Broker-Dealer with its principal place of business in St. Cloud, Minnesota. (Compl. ¶ 17.) Guaranty Brokerage Services, Inc., is a wholly owned subsidiary of PrimeVest and, according to the Complaint, shares PrimeVest's principal place of business, introduces clients to PrimeVest, clears transactions to PrimeVest, has its books, records, accounts, funds, securities and customer accounts maintained by PrimeVest, and shares a Chief Compliance Officer with PrimeVest. (*Id*. ¶ 18.) Similar to Guaranty Brokerage Services, the Complaint alleges that Bancnorth Investment Group, Inc., is a wholly owned

3

subsidiary of PrimeVest that has the same relationship with PrimeVest as Guaranty Brokerage Services. (*Id*. ¶ 19.) The Complaint notes that all allegations in the Complaint that reference PrimeVest should be read to also apply to Guaranty and Bancnorth. (*Id*. ¶¶ 18, 19.) ING America Insurance Holdings, Inc., a Delaware corporation, was the 100% owner and control person of PrimeVest until February 1, 2010. (*Id*. ¶ 20.) ING Advisors Network was an independent broker-dealer network consisting of Financial Network Investment Corporation, ING Financial Partners, Inc., Multi-Financial Securities Corporation, and PrimeVest. (*Id*. ¶ 21.) On February 1, 2010, ING Advisors changed its name to Cetera Financial Group, owned by Lightyear Capital LLC, a private equity company that on February 1, 2010, completed an acquisition of PrimeVest. (*Id*. ¶¶ 21, 23.)

The Complaint specifically alleges that between March 4, 2008, and March 7, 2008, Plaintiffs completed New Account Applications for PrimeVest brokerage accounts.[1] (Compl. ¶¶ 13-16.) On or about March 17, 2008, Plaintiff Marcy Jaspers purchased 39,924.04 Class A shares of the Franklin Minnesota Insured Tax-Free Income Fund ("FMINX") for a total investment of $488,271. (*Id*. ¶ 98.) The Complaint alleges that the FMINX shares were divided up between the accounts of Marcy Jaspers and her three children—Gary Jaspers, Donna Mae Jaspers, and Mary Jo Jaspers. (*Id*. ¶¶ 99-102.)

According to the Complaint, Marcy Jaspers' purchase of $488,271 of FMINX shares was eligible for Rights of Accumulation and thus a 2.5% sales charge. (*Id*. ¶¶ 98,

---

[1] According to the Complaint, Plaintiff Mary Jaspers' original New Account Application was completed on April 29, 2003. (Compl. ¶ 13.)

4

104.) However, the Complaint asserts that Marcy Jaspers paid a 3.52% sales charge on these purchases. (*Id*. ¶ 99-102.) The Complaint alleges that because PrimeVest failed to combine Plaintiffs' purchases and apply the appropriate breakpoint discounts to the purchases, Plaintiffs were overcharged $4,980.37 in sales charges. (*Id*. ¶¶ 104-05.) The Complaint further alleges that because PrimeVest failed to provide the correct breakpoint discount to Plaintiffs' purchases, PrimeVest also received extra commissions to which it was not entitled. (*Id*. ¶¶ 111-12.)

The Complaint alleges that ING and PrimeVest engaged in marketing "with the intent of inducing each and every []customer to rely upon ING's and PrimeVest's representations. . . ." (Compl. ¶ 40.) Under the heading "PrimeVest and its Representations," the Complaint details a number of statements that PrimeVest made on its webpage and its promotional materials to market its services. (*Id*. ¶¶ 37-60.) The Complaint asserts that "[b]y explaining that it fully supports the efforts of the SEC and FINRA, PrimeVest gives investors the impression that they are worthy of trust and are in compliance with all applicable rules and regulations." (*Id*. ¶ 45.) The Complaint goes on to describe how, through such statements, ING and PrimeVest "encouraged prospective and current Clients to entrust the companies with their money." (*Id*. ¶ 46.) The Complaint notes that PrimeVest "markets itself as a company that makes it easier for its clients to invest" and that [b]y making these representations, PrimeVest indicates to its Clients that once they decide upon a purchase or sale of an investment or security, PrimeVest will ensure that the transaction is executed properly, accurately and with a high degree of professionalism." (*Id*. ¶ 47.) Plaintiffs cite to a brochure produced by

5

PrimeVest in which PrimeVest "reassures investors that '[w]e have developed an internal Code of Ethics as well as an extensive set of policies and procedures applicable to our business, and expect high standards of conduct from our financial professionals.'" (*Id.* ¶ 55.)

Further, the Complaint alleges that "PrimeVest affirmatively promoted the quality of its transaction settlement services" on its webpage. (*Id.* ¶ 56.) Specifically, the Complaint alleges that the webpage stated that PrimeVest uses "the latest technology to clear and settle your brokerage transactions quickly and accurately. In this fashion, PrimeVest has control over the quality of its service, responsiveness of its operation, and expertise of its people." (*Id.* ¶¶ 56, 59)

The Complaint also asserts that PrimeVest's Account Agreements with Plaintiffs stated that, depending on the size of a transaction, certain volume discounts might apply. (*Id.* ¶ 64.) Specifically, the Complaint states that the Account Agreements indicated, "[y]our sales charges and expenses, and the sales commissions paid to us and our representatives, differ from investment to investment, and may depend on the amount of money you invest." (*Id.* ¶ 64.) The Complaint further alleges that these statements gave rise to a series of obligations, including, among other things, exercising due care in executing the clients' transactions, obtaining the most advantageous pricing, and meeting the professional standards of broker-dealers. (Compl. ¶ 66.) The Complaint later alleges that these same obligations occurred by virtue of PrimeVest and ING's contracts with Plaintiffs. (*Id.* ¶ 72.) Moreover, the Complaint specifically states:

> Neither the New Account Application nor the Customer Agreement sets forth the full terms and conditions of the agreement because they do not discuss PrimeVest's promises and duties to its Clients. The Defendants' promises are contained in various documents and promotional material that they provide to their Clients. All these documents together make up the parties' agreement.

(*Id.* ¶ 5.)

Based on these and other allegations, the Complaint asserts causes of action for breach of contract, breach of fiduciary duty, unjust enrichment, negligence, and gross negligence, and includes claims for violations of the Minnesota Prevention of Consumer Fraud Act, the Minnesota Deceptive Trade Practices Act, and the Minnesota False Statements in Advertising Act. On behalf of themselves and the putative class, Plaintiffs seek class certification, money damages, attorney fees and expenses, and injunctive relief. Plaintiffs assert that they "believe that there are hundreds of members of the [putative] Class, if not more. . . ." (*Id.* ¶ 114.)

## DISCUSSION

**I.     Standard of Review**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court may consider the complaint,

matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id*. at 555. As the United States Supreme Court recently reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

**II.  SLUSA**

In their Motion to Dismiss, Defendants contend that Plaintiffs' claims are barred by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") and that the Complaint should be dismissed. Congress enacted the Private Securities Litigation Reform Act ("PSLRA") in 1995 to target "perceived abuses of the class-action vehicle in litigation involving nationally traded securities." *Merrill Lynch, Pierce, Fenner & Smith v. Dabit*, 547 U.S. 71, 81 (2006). After the PSLRA was enacted, litigants attempted to circumvent the PSLRA and its heightened burdens and pleading requirements by bringing class actions in state court pursuant to state law. *Id*. at 81-82. "To stem this

'shif[t] from Federal to State courts' and 'prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of' the [PSLRA]," Congress enacted SLUSA. *Id.*

SLUSA "expressly preempts all 'covered' state-law class actions that allege: (1) an untrue statement or omission of a material fact, or (2) use of a manipulative or deceptive device or contrivance, 'in connection with the purchase or sale of a covered security.'" *Siepel v. Bank of America, N.A.*, 526 F.3d 1122, 1126 (8th Cir. 2008) (citing 15 U.S.C. §§ 77p(b), 77bb(f)(1), and *Dudek v. Prudential Sec., Inc.*, 295 F.3d 875, 879 (8th Cir. 2002)). As one court summarized:

> SLUSA is "an express exception to the well-pleaded complaint rule." . . . . Even where plaintiffs attempt to conceal claims based on the misrepresentation or omission of material facts with state law labels, courts disregard such labels and dismiss the claims as preempted by SLUSA. . . . Thus, the Court must focus on the substance of the allegations and be wary of efforts to circumvent SLUSA through artful pleading. . . . When the gravamen of the complaint involves an untrue statement or substantive omission of a material fact, and when that conduct coincides with a transaction involving a covered security, SLUSA mandates dismissal.

*Kutten v. Bank of America, N.A.,* 2007 U.S. Dist. LEXIS 63897, at *1, *10-11 (E.D. Mo. August 29, 2007) (citations omitted).

The parties agree that this is a "covered class action" under SLUSA and that Plaintiffs' Complaint asserts solely state-law causes of action. (Doc. No. 27 at 7; Doc. No. 32 at 7.) However, the parties dispute the final two elements, namely, (a) whether Plaintiffs' Complaint alleges misrepresentations and/or omissions of material fact; and (b) whether the alleged misrepresentations were made "in connection with" the purchase of a "covered security."

### A. "Misrepresentations"

First, Defendants contend that the Complaint alleges misrepresentations or omissions of material fact because it alleges that Defendants made material false statements that induced Plaintiffs to purchase securities through Defendants, resulting in Plaintiffs' damages. Defendants point to Plaintiffs' allegations that PrimeVest was in compliance with all rules and regulations of the SEC and FINRA; that PrimeVest would "ensure that [its customer's] transaction is executed properly, accurately, and with a high degree of professionalism"; and that PrimeVest represented that it had control over the "quality of its service, responsiveness of its operation, and expertise of its people." (Compl. ¶¶ 45, 47, 55, 56, 59.) All of these allegations are incorporated into each of Plaintiffs' claims.

Further, Defendants note that Plaintiffs' claims brought pursuant to the Minnesota Prevention of Consumer Fraud Act (Count 4), the Minnesota Deceptive Trade Practices Act (Count 5), and the Minnesota False Statements in Advertising Act (Count 6) all require a false statement or other misrepresentation as a core element. Defendants assert that the remaining counts—breach of contract (Count 1), breach of fiduciary duty (Count 2), unjust enrichment (Count 3), negligence (Count 7), and gross negligence (Count 8)— rely on Defendants' alleged misrepresentations and should similarly be dismissed. Alternatively, Defendants assert that the Complaint alleges the use of a manipulative or deceptive device in that the objective of Defendants' alleged scheme was to deprive Plaintiffs of the breakpoint discounts and to allow Defendants to receive excess commissions.

Plaintiffs contend that allegations of material misrepresentations are not the factual predicate of their claims. Plaintiffs assert:

> Defendants made a series of representations to Plaintiffs regarding the services they would provide and the level of quality of those services. Those representations were part of Plaintiffs' contract with Defendants and gave rise to a series of duties to Plaintiffs. By failing to execute mutual fund transactions in accordance with those contractual and common law duties, Defendants breached their contract with Plaintiffs, were negligent, grossly negligent, breached their fiduciary duties, and were unjustly enriched.

(Pls.' Mem. in Opp. at 8-9.)

On a close reading of the Complaint and Plaintiffs' own characterization of the Complaint, the Court finds that the crux of the Complaint is Defendants' alleged misrepresentations. The Complaint focuses on Defendants' statements regarding the integrity of Defendants' services and compliance with rules and regulations made in their promotional materials and webpage. The Complaint alleges that such statements induced clients to entrust Defendants with their money. Specifically, the Complaint alleges that PrimeVest "gives investors the impression that they are worthy of trust and are in compliance with all [SEC and FINRA] rules and regulations." (Compl. ¶ 45.) The Complaint alleges that these and other statements "encouraged prospective and current Clients to entrust the companies with their money." (*Id*. ¶ 46.) The Complaint further alleges that PrimeVest represented that it would "ensure that the transaction is executed properly, accurately and with a high degree of professionalism" and that PrimeVest has a "duty to adhere to the professional standards, rules and obligations that generally govern the conduct of Broker-Dealers." (*Id*. ¶ 47.) The Complaint notes Defendants' duty to

11

obtain the best execution on client transactions by purchasing the mutual fund shares "at the correct time, at the correct price and applying the correct Sales Charges." (*Id.* ¶ 51.) The Complaint also notes PrimeVest's representations regarding its internal "Code of Ethics" and "extensive set of policies and procedures" applicable to the business and that PrimeVest "affirmatively promoted the quality and accuracy of its transaction settlement services. . . ." (*Id.* ¶¶ 55-56.) The Complaint asserts that PrimeVest's webpage "reassures potential investors that 'PrimeVest has control of the quality of its service, responsiveness of its operation, and expertise of its people.'" (*Id.* ¶ 59.)

> The Complaint further alleges:
>
> By making the above representations to Plaintiffs . . . , by virtue of its status as a registered Broker-Dealer and through its other actions and statements, . . . PrimeVest and ING obligated themselves to: (i) exercise due care in executing their Clients' transactions; (ii) exercise such care, skill and diligence as Broker-Dealers ordinarily exercise in executing Client transactions; (iii) exert reasonable diligence on behalf of their Clients; (iv) ensure that their recommendations to their Clients are suitable; (v) obtain the most advantageous pricing possible with respect to their transactions; (vi) meet the professional standards required of Broker-Dealers; (vii) apply all applicable or available Breakpoint discounts; (viii) supervise their agents; and (ix) follow the relevant rules and regulations that govern the activities and conduct of Broker-Dealers.

(*Id.* ¶ 66.) The Complaint also asserts that these same obligations occurred by virtue of PrimeVest's contractual obligations. (*Id.* ¶ 72.)

All of Plaintiffs' allegations regarding Defendants' representations are incorporated by reference in the individual counts of the Complaint. (Compl. ¶¶ 122, 130, 141, 149, 156, 163, 169, 175.) These allegations stem from the idea that, on their website and in their promotional materials, Defendants made certain representations but

12

did not follow through with these representations. As for the promotional materials, the Complaint notes that "all of this information taken together makes up the parties' agreement" – the very agreement that Defendants allegedly breached by failing to provide appropriate breakpoint discounts. (Compl. ¶ 124, 128.) And the Complaint specifically notes the "materially false and misleading statements concerning the scope and quality of services [Defendants] provided." (*Id*. ¶¶ 152, 159.)

Plaintiffs attempt to avoid the application of SLUSA by asserting that the Complaint's allegations regarding Defendants' statements were not attempts to characterize such statements as false. Rather, Plaintiffs claim that Defendants' "statements were promises that created contractual and common law duties requiring PrimeVest to 'ensure that [any] transaction is executed properly, accurately and with a high degree of professionalism.'" (Pls.' Mem. in Opp. at 11 n.4.) Whether couched as broken promises or as a different state-law cause of action, however, the heart of these allegations is a misrepresentation.

On these bases, the Court finds that Plaintiffs have alleged misrepresentations that place the allegations of the Complaint within the parameters of SLUSA.[2]

### B. "In connection with"

There appears to be no dispute that the Class A mutual fund shares referenced in Plaintiffs' Complaint constitute "covered securities" under SLUSA. However, the parties dispute the "in connection with" requirement. In support of their contention that the

---

[2] The Court finds no authority to support Plaintiffs' arguments regarding SEC regulatory authority over breakpoint discount issues pursuant to Rule 10b-5.

misrepresentations in Plaintiffs' Complaint were made "in connection with" the purchase of securities, Defendants point to the Complaint's allegations that Defendants' misrepresentations induced Plaintiffs to purchase their mutual fund shares through PrimeVest. Alternatively, Defendants contend that the Complaint alleges that Defendants employed a deceptive device to deprive Plaintiffs of breakpoint discounts and increase Defendants' commissions.

Plaintiffs, on the other hand, assert that their consumer protection claims do not arise in connection with the purchase or sale of a security because these claims focus on Defendants' alleged misleading statements regarding the scope and quality of services provided and regarding Defendants' broker-dealer services. Plaintiffs contend that the allegedly misleading statements were intended to induce Plaintiffs to use Defendants' broker-dealer services, rather than to precipitate any discrete transaction.[3] Thus, Plaintiffs assert that their claims accrued at the time that Plaintiffs entered into a contractual relationship with PrimeVest—five years before Plaintiff Marcy Jaspers engaged in any covered securities transaction with PrimeVest.

In *Dabit*, the Supreme Court instructed that "it is enough that the fraud alleged 'coincide' with a securities transaction." *Dabit*, 547 U.S. at 85; *see also Siepel,* 526 F.3d

---

[3] Plaintiffs also assert that Defendants have not established that Plaintiffs' consumer protection claims involve any misrepresentation or fraud. However, these counts plainly fall within the ambit of SLUSA in that they specifically allege that Defendants "made materially false and misleading statements to Plaintiffs" regarding the scope and quality of services they provided or "caused, directly and indirectly, to be made, published, disseminated, circulated, or placed before the public, advertisements regarding their Broker-Dealer services containing material assertions, representations, and statements of fact that were untrue, deceptive, and misleading." (Compl. ¶¶ 152, 159, 166.)

14

at 1127. *Dabit* and *Siepel* instruct the Court to apply the "in connection with" language broadly to give effect to the purpose of PSLRA's procedural reforms. *Dabit*, 547 U.S. at 85-86; *Siepel*, 526 F.3d at 1127.

Here, Plaintiffs' allegations are directly related to the brokerage services that Defendants promised to provide. Plaintiffs specifically allege that Defendants' representations induced Plaintiffs to purchase securities through Defendants, resulting in Defendants receiving extra commissions. On this basis, the Court finds that the alleged misrepresentations were made "in connection with" the securities transactions at issue to bring them within the realm of SLUSA.

Based on the foregoing, Plaintiffs' claims here are dismissed without prejudice. Because of the Court's disposition of the motion to dismiss, the Court need not address Plaintiffs' motion to remand.

## ORDER

1. Defendants' Motion to Dismiss (Doc. No. [12]) is **GRANTED**;

2. Plaintiffs' Motion to Remand (Doc. No. [19]) is **DENIED AS MOOT**.

3. The Complaint is **DISMISSED WITHOUT PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: August 30, 2010
s/Donovan W. Frank
DONOVAN W. FRANK
United States District Court Judge